BATTERTON, SECRETARY, DEPARTMENT OF
HUMAN RESOURCES OF MARYLAND, ET AL.
*v.* FRANCIS ET AL.

No. 75–1181.   Argued April 19, 1977—Decided June 20, 1977

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 432.

*Joel J. Rabin,* Assistant Attorney General of Maryland, argued the cause for petitioners. With him on the brief were *Francis B. Burch,* Attorney General, *George A. Nilson,* Deputy Attorney General, and *Theodore Losin,* Assistant Attorney General.

*C. Christopher Brown* argued the cause for respondents Francis et al. With him on the brief was *Dennis M. Sweeney. Gerard C. Smetana, William H. DuRoss III, Lawrence B. Kraus,* and *Richard O'Brecht* filed briefs for respondent Chamber of Commerce of the United States.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the validity of 45 CFR § 233.100 (a) (1) (1976),[1] a regulation promulgated by the Secretary of

---

[1] "§ 233.100   Dependent children of unemployed fathers.

"(a) *Requirements for State Plans.* If a State wishes to provide AFDC for children of unemployed fathers, the State plan under Title IV—Part A of the Social Security Act must, except as specified in paragraph (b) of this section:

"(1) Include a definition of an unemployed father which shall apply

Health, Education, and Welfare (HEW) pursuant to a delegation of rulemaking authority in § 407 (a) of the Social Security Act, 42 U. S. C. § 607 (a).[2] The issue is whether the regulation is a proper exercise of the Secretary's statutory authority.

## I

The statute is contained in the Social Security Act's Title IV, which has to do primarily with Aid to Families with Dependent Children (AFDC). The AFDC program was established by the Act in 1935 to provide welfare payments where children are needy because of the death, absence, or incapacity of a parent. 42 U. S. C. § 606 (a). The original conception of AFDC was to allow widows and divorced mothers to care for their children at home without having to go to work, thus eliminating the practice of removing needy children in situations of that kind to institutions. See *Burns* v. *Alcala,*

---

only to families determined to be needy in accordance with the provisions in § 233.20 of this chapter. Such definition must include any father who:

"(i) Is employed less than 100 hours a month; or

"(ii) Exceeds that standard for a particular month, if his work is intermittent and the excess is of a temporary nature as evidenced by the fact that he was under the 100-hour standard for the prior 2 months and is expected to be under the standard during the next month;

"except that, at the option of the State, such definition need not include a father whose unemployment results from participation in a labor dispute or who is unemployed by reason of conduct or circumstances which result or would result in disqualification for unemployment compensation under the State's unemployment compensation law."

[2] "§ 607. Dependent children of unemployed fathers; definition.

"(a) The term 'dependent child' shall, notwithstanding section 606 (a) of this title, include a needy child who meets the requirements of section 606 (a)(2) of this title who has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary) of his father, and who is living with any of the relatives specified in section 606 (a)(1) of this title in a place of residence maintained by one or more of such relatives as his (or their) own home."

420 U. S. 575, 581–582 (1975). AFDC was not originally designed to assist children who are needy simply because the family breadwinner is unable to find work; it was contemplated that other programs would alleviate that problem by attacking unemployment directly. See *Carleson* v. *Remillard,* 406 U. S. 598, 603 (1972); *King* v. *Smith,* 392 U. S. 309, 313, 327–329 (1968). Other parts of the Act encouraged the establishment of state unemployment compensation programs, primarily through tax incentives, but the federal role in these programs is not so great as in AFDC. See *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471 (1977).

Title IV was amended in 1961 to add § 407. Pub. L. 87–31, § 1, 75 Stat. 75. This section established an experimental program (AFDC–UF) [3] to provide assistance in some cases where the unemployment of a parent causes dependent children to be needy. The States were given broad power to define "unemployment" for purposes of the program and to determine the relationship of this new program to existing state unemployment compensation plans. In 1968 the AFDC–UF program was made permanent, 81 Stat. 882, but the eligibility criteria were modified to withdraw some of the definitional authority delegated to the States. The statute now requires a participating State to provide assistance where a needy child "has been deprived of parental support or care by reason of the unemployment (as determined in accordance with standards prescribed by the Secretary) of his father." 42 U. S. C. § 607 (a). See *Philbrook* v. *Glodgett,* 421 U. S. 707, 709–711 (1975).[4]

---

[3] The program originally was to expire June 30, 1962. It was extended, however, first for five years, 76 Stat. 193, and then to June 30, 1968, 81 Stat. 94.

[4] Before the 1968 amendments, § 407 (a) referred to "unemployment (as defined by the State)." 75 Stat. 75. Under the original statute the States were also free to decide to what extent receipt of unemployment compensation would affect eligibility for AFDC–UF benefits. Section 407 (b)(2)(C)(ii) was added and amended in 1968 to require participating

Both AFDC and AFDC–UF are cooperative ventures of the Federal Government and the States. States that elect to participate in these programs administer them under federal standards and HEW supervision. Funding is provided from state and federal revenues on a matching basis. See, *e. g., Shea* v. *Vialpando,* 416 U. S. 251, 253 (1974); *King* v. *Smith,* 392 U. S., at 316. Although every State currently participates in AFDC, only about half the States participate in the AFDC–UF program. Dept. of HEW, Public Assistance Statistics, Oct. 1976, table 5, p. 9 (1977).

## II

The instant case originated in 1971 as a challenge to Rule 200.X.(A)(2) of the Maryland Department of Employment and Social Services. That Rule denies AFDC–UF benefits to families where the father is out of work for reasons that disqualify him for state unemployment insurance compensation.[5]

States to deny AFDC–UF benefits "with respect to any week for which such child's father receives unemployment compensation under an unemployment compensation law of a State or of the United States." § 302, 82 Stat. 273.

In *Philbrook* v. *Glodgett,* 421 U. S., at 710 n. 6, 719, the Court observed that a purpose of the 1968 amendments was to eliminate variations in AFDC–UF coverage among the States. Accordingly, § 407 (b)(2)(C)(ii) was held to establish a nationwide test of eligibility under which only the actual "receipt" of unemployment compensation would preclude AFDC–UF benefits. Thus the States were required to allow persons eligible for both programs to refuse unemployment compensation and receive AFDC–UF benefits instead. 421 U. S., at 713–719.

The effect of the Court's decision in *Philbrook* was counteracted the following year when Congress again amended § 407 (b)(2)(C)(ii) to require denial of AFDC–UF benefits where a father is qualified for unemployment compensation but refuses to apply for or accept it. Pub. L. 94–566, § 502, 90 Stat. 2688.

[5] This Rule, which has since been redesignated COMAR 07.02.09.10 (A) (2) (1975), provides that AFDC–UF benefits may not be paid "[t]o meet need due to being disqualified for unemployment insurance." Maryland's Unemployment Insurance Law specifies various grounds that disqualify

The original plaintiffs represented two classes of families with dependent children who were thereby ineligible for AFDC–UF benefits: one where the father had been discharged for misconduct (excessive absenteeism), and the other where the father was out of work because of a strike. The defendants were Maryland officials having responsibility for the administration of public assistance grants in the State. A three-judge United States District Court was convened to consider the claim that Rule 200.X.(A)(2) violated the Equal Protection Clause of the Fourteenth Amendment. The court sustained the constitutionality of the state regulation but went on to hold it invalid because it was contrary to the federal regulation prescribing standards for the determination of unemployment under the AFDC–UF program. *Francis* v. *Davidson,* 340 F. Supp. 351 (Md.), summarily aff'd, 409 U. S. 904 (1972) (*Francis I*). Although HEW did not agree that its regulation was inconsistent with Rule 200.X.(A)(2), the Solicitor General, in his memorandum for the United States as *amicus curiae,* filed in *Francis I* at this Court's invitation, 408 U. S. 920 (1972), suggested a summary affirmance in that case in light of the then-forthcoming revision of the HEW regulation.

The HEW regulation, as amended, expressly authorizes some state discretion in defining unemployment. Generally, it requires the States to consider a person to be unemployed for AFDC–UF purposes if he works less than 100 hours a month, except for intermittent employment, and "except that, at the option of the State, such definition need not include a father whose unemployment results from participation in a labor dispute or who is unemployed by reason of conduct or circumstances which result or would result in disqualification

otherwise eligible individuals from receiving benefits. These grounds include, among others, voluntarily leaving work without good cause, gross misconduct, discharge or suspension as a disciplinary measure (temporary disqualification for not less than one week and for not more than nine weeks), and certain work stoppages due to labor disputes other than lockouts. Md. Ann. Code, art. 95A, §§ 6 (a), (b), (c), and (e) (1969).

for unemployment compensation under the State's unemployment compensation law." 45 CFR § 233.100 (a)(1) (1976). The Secretary had stated that the purpose of this amendment was to nullify the effect of *Francis I* by making explicit the HEW policy of allowing the States to exclude AFDC-UF participants based on the particular reason that the father was out of work.[6]

---

[6] The notice of rulemaking read:

"Dependent Children of Unemployed Fathers

"Notice is hereby given that the regulation set forth in tentative, alternative form below is proposed by the Administrator, Social and Rehabilitation Service, with the approval of the Secretary of Health, Education, and Welfare. Both alternatives would amend § 233.100 (a)(1), which provides a Federal definition of unemployed father under the AFDC program in terms of hours of work.

"In applying the existing regulation, the Department policy has been to permit a State, at its option, to use a definition of unemployed father which imposes additional conditions relating to the reason for the unemployment, *e. g.,* the State definition might exclude a father whose unemployment results from participation in a labor dispute or who is unemployed by reason of conduct or circumstances which result or would result in disqualification for unemployment compensation under the State's unemployment compensation law. In *Davidson* v. *Francis,* the U. S. Supreme Court on October 16, summarily affirmed the judgment of the district court which held, in effect, that while the Secretary has broad authority to define an unemployed father for purposes of section 407 of the Social Security Act, the existing Federal regulation provides only an hours-of-work test, and thus prohibits a State from excluding fathers who meet this test but are disqualified for unemployment compensation.

"Accordingly, the proposed alternative A below would amend the regulation to make the prior Department policy explicit, by stating the options which are permitted to the States in defining an unemployed father. Alternative B, on the other hand, would amend the regulation to make clear that the hours-of-work test is intended as the exclusive definition of unemployed father, so that States may not have definitions which impose added conditions. This would be a change in Department policy, but would be consistent with the way that the existing regulation has been interpreted by the courts." 38 Fed. Reg. 49 (1973).

"Alternative A" was eventually adopted. *Id.,* at 18549.

After the amended HEW regulation became effective, the defendant Maryland officials moved that the District Court dissolve its earlier injunction issued March 16, 1972, after *Francis I* had been decided, against enforcement of Rule 200.X.(A)(2). That court recognized that "[t]he conflict between the federal and the Maryland regulation ended after the former was amended," but nevertheless it denied the motion and continued the injunction on the ground that the amended federal regulation now was in conflict with the federal statute. *Francis v. Davidson,* 379 F. Supp. 78, 81 (Md. 1974) (*Francis II*). First, with regard to the class of fathers discharged for misconduct, the District Court stated that these people are necessarily "unemployed," within the meaning of the statute, and that any contrary regulation is invalid. Second, the court recognized that it is not clear whether the statutory term "unemployed" includes persons involved in a labor dispute. The court held, however, that the HEW regulation was invalid in this regard because it delegated the question of coverage to the States without providing a uniform national standard. *Id.,* at 81–82.

After this Court dismissed a direct appeal in *Francis II* for want of jurisdiction, 419 U. S. 1042 (1974), appeals were taken by the state defendants and by the Chamber of Commerce of the United States, as intervenor, to the United States Court of Appeals for the Fourth Circuit. There the case was consolidated with an appeal in a similar case, *Bethea v. Mason,* 384 F. Supp. 1274 (Md. 1974), where a single District Judge had followed *Francis II* in holding the same HEW regulation invalid insofar as it authorized the State to deny AFDC–UF benefits to fathers who had voluntarily quit their previous jobs.

The Fourth Circuit affirmed the three appeals in an unpublished *per curiam* adopting the respective opinions of the two District Judges. See 529 F. 2d 514 and 515 (1975). The state defendants petitioned for certiorari, contending that the

current HEW regulation is authorized by the federal statute and that the injunction against the state regulation therefore should be dissolved.[7]   The Solicitor General, at the invitation of the Court, 425 U. S. 969 (1976), filed a memorandum for the United States as *amicus curiae,* supporting the state defendants' position.   We granted certiorari.   429 U. S. 939 (1976).

## III

The ultimate question in this case is whether the statutory term "unemployment" may be interpreted to allow the State to exclude the three classes of respondents from receiving AFDC–UF benefits.   There can be no doubt that 45 CFR § 233.100 (a)(1) (1976) embodies that interpretation.   Thus, the actual issue we must decide is not how the statutory term should be interpreted, but whether the Secretary's regulation is proper.

Ordinarily, administrative interpretations of statutory terms are given important but not controlling significance.   This was the Court's approach, for example, when it had under consideration the question whether the term "wages" in Title II of the Social Security Act included a backpay award. *Social Security Board* v. *Nierotko,* 327 U. S. 358, 369 (1946).[8]

---

[7] The Chamber of Commerce of the United States, as intervenor in *Francis II,* also filed a petition for certiorari, No. 75–1182, arguing that federal labor policy prohibits the payment of welfare benefits to persons involved in labor disputes.   Although we did not act on its petition, the Chamber filed a brief as respondent-intervenor in the present case.   In light of today's decision, the petition for certiorari in No. 75–1182 is denied.

[8] The Court there explained:

"Administration, when it interprets a statute so as to make it apply to particular circumstances, acts as a delegate to the legislative power. Congress might have declared that 'back pay' awards under the Labor Act should or should not be treated as wages.   Congress might have delegated to the Social Security Board to determine what compensation paid by employers to employees should be treated as wages.   Except as such

Unlike the statutory term in Title II, however, Congress in § 407 (a) expressly *delegated* to the Secretary the power to prescribe standards for determining what constitutes "unemployment" for purposes of AFDC–UF eligibility. In a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different, manner. *American Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232, 235–237 (1936).[9]

interpretive power may be included in the agencies' administrative functions, Congress did neither. An agency may not finally decide the limits of its statutory power. That is a judicial function. Congress used a well understood word—'wages'—to indicate the receipts which were to govern taxes and benefits under the Social Security Act. There may be borderline payments to employees on which courts would follow administrative determination as to whether such payments were or were not wages under the act.

"We conclude, however, that the Board's interpretation of this statute to exclude back pay goes beyond the boundaries of administrative routine and the statutory limits." 327 U. S., at 369 (footnote omitted).

[9] Legislative, or substantive, regulations are "issued by an agency pursuant to statutory authority and . . . implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission . . . . Such rules have the force and effect of law." U. S. Dept. of Justice, Attorney' General's Manual on the Administrative Procedure Act 30 n. 3 (1947). See *United States* v. *Mersky,* 361 U. S. 431, 437–438 (1960); *Atchison, T. & S. F. R. Co.* v. *Scarlett,* 300 U. S. 471, 474 (1937).

By way of contrast, a court is not required to give effect to an interpretative regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise. See *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 141–145 (1976); *Morton* v. *Ruiz,* 415 U. S. 199, 231–237 (1974); *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944).

See generally K. Davis, Administrative Law Treatise § 5.03 (1958 and

The regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S. C. §§ 706 (2)(A), (C).[10]

## IV

We turn now to the grounds on which the District Courts and the Court of Appeals held the regulation invalid, keeping in mind the narrow scope of review that is indicated in this situation.

These courts held that the Secretary exceeded his statutory authority to prescribe standards, in the first place, because he permitted the determination of eligibility to turn in part on the reason for the father's unemployment. The language of § 407 (a) was thought to make the only relevant consideration that of whether, not why, the father was out of work:

> " 'A man out of work because he was discharged for cause by his employer *is unemployed.* There can be no two ways about that conclusion' . . . . [N]o combination of federal and state regulations may provide that a father who is unemployed is not unemployed." *Francis II,* 379 F. Supp., at 81, quoting *Francis I,* 340 F. Supp., at 366.

And in *Bethea* the court by like reasoning held that a person who voluntarily quit his job is to be considered unemployed

Supps. 1970, 1976); L. Jaffe, Judicial Control of Administrative Action 564–565 (1965).

[10] The other kinds of review provided by the Administrative Procedure Act are not involved in this case. The constitutionality and procedural aspects of the regulation, 5 U. S. C. §§ 706 (2) (B), (D), are not at issue at this time. Neither substantial-evidence review nor trial *de novo,* §§ 706 (2) (E), (F), was available in this case. See *Camp* v. *Pitts,* 411 U. S. 138, 140–142 (1973); *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 413–416 (1971).

within the meaning of the statute. 384 F. Supp., at 1280–1281.

We do not agree that the statutory language is so unambiguous. The term "unemployment" is often used in a specialized context where its meaning is other than simply not having a job. For example, the concept of unemployment is frequently limited to persons who have some connection with the work force, that is, individuals who desire to work and are capable of working, and who, usually but not always, have held· jobs in the past. In addition, the feature of involuntariness is often linked with unemployment. Limitations of this nature are found in the definitions used by the Department of Labor in compiling unemployment statistics.[11] State unemployment compensation programs generally confine their benefits in this manner.[12] Indeed, the other provisions of

---

[11] "Employed persons are (1) those who worked for pay any time during the week which includes the 12th day of the month or who worked unpaid for 15 hours or more in a family-operated enterprise and (2) those who were temporarily absent from their regular jobs because of illness, vacation, industrial dispute, or similar reasons. . . .

"Unemployed persons are those who did not work during the survey week, but were available for work except for temporary illness and had looked for jobs within the preceding 4 weeks. Persons who were available for work but did not work because they were on layoff or waiting to start new jobs within the next 30 days are also counted among the unemployed. . . .

". . . Persons not in the labor force are those not classified as employed or unemployed; this group includes persons retired, those engaged in their own housework, those not working while attending school, those unable to work because of long-term illness, those discouraged from seeking work because of personal or job market factors and those who are voluntarily idle. . . ." U. S. Dept. of Labor, Monthly Labor Review 91 (Apr. 1977).

[12] "Unemployment insurance programs are designed to provide cash benefits to regularly employed members of the labor force who become involuntarily unemployed and who are able and willing to accept suitable jobs." Dept. of HEW, Social Security Programs in the United States 54 (1971). See also *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S., at 482, and 487 n. 15.

§ 407 impose similar limitations, indicating that the AFDC–UF program was not intended to provide assistance without regard to the reason a person is out of work.[13]

Thus, we conclude that the statutory term is capable of more than the tautological definition imposed by the District Judges and the Court of Appeals. Congress itself must have appreciated that the meaning of the statutory term was not self-evident, or it would not have given the Secretary the power to prescribe standards.

Respondents argue, however, that Congress intended that the Secretary prescribe an "hours-worked" standard for determining unemployment but did not intend any further additions to the eligibility criteria specified in other provisions of the statute. In fact, a minimum hours-worked standard is part of the regulation at issue in this case, but there is no indication in the statutory language or legislative history that Congress intended to foreclose other factors in the determination of what constitutes unemployment for purposes of the AFDC–UF program.

Of course, the Secretary's statutory authority to prescribe standards is not unlimited. He could not, for example, adopt a regulation that bears no relationship to any recognized concept of unemployment or that would defeat the purpose of the AFDC–UF program. But the regulation here at issue does not even approach these limits of the delegated authority. By allowing the States to exclude persons who would be disqualified under the State's unemployment compensation law, the Secretary has incorporated a well-known and widely applied standard for "unemployment." Exclusion of individuals who are out of work as a result of their own conduct and thus disqualified from state unemployment compensation

---

[13] Among the conditions imposed by § 407 (b) are requirements that the unemployed father have a substantial connection with the work force and that he actively seek employment. See *Philbrook* v. *Glodgett*, 421 U. S. 707, 710 n. 6 (1975).

is consistent with the goal of AFDC–UF, namely, to aid the families of the involuntarily unemployed.[14] On the other hand, state unemployment benefits are ordinarily available only after a waiting period and only for a limited number of weeks or months. By providing benefits during the periods before and after state unemployment compensation is available, AFDC–UF fills a significant gap in social insurance coverage.[15] Thus we cannot say that the Secretary's regulation defeats the purpose of the AFDC–UF program.

We therefore hold that the HEW regulation, to the extent it allows the States to determine that persons disqualified under unemployment compensation laws are not "unemployed" under § 407 (a), is within the statutory authority delegated to the Secretary, and is reasonable.

## V

The second stated reason for the District Judges' and Court of Appeals' holding that the Secretary's regulation was invalid was that it permitted the States the option of denying unemployment compensation benefits to participants in a labor dispute.[16] Although the holding is not entirely clear to us, it

---

[14] In describing the bill on the floor of the House, a cosponsor stated that the concern was with the "involuntarily unemployed and I put the emphasis on the word 'involuntarily.'" 107 Cong. Rec. 3767 (1961) (remarks of Cong. Byrnes).

[15] When President Kennedy proposed the adoption of the AFDC–UF program in 1961, the only example he gave of the sort of person that would be covered was one "who has exhausted unemployment benefits and is not receiving adequate local assistance. . . ." Message from the President on Economic Recovery and Growth, 107 Cong. Rec. 1679 (1961).

[16] Although 45 CFR § 233.100 (a) (1) (1976) contains a separate option for States to exclude labor-dispute participants from AFDC–UF, Maryland has incorporated its labor-dispute rule as a disqualification for unemployment compensation. The labor-dispute provision of the federal regulation, therefore, is not directly at issue in this case. We attach no significance to the approach followed by Maryland in this case.

appears that what was regarded as fatal was the Secretary's failure to impose sufficient standards to control the States' decisions under this optional feature.[17]  Presumably, the same rationale would provide an alternative basis for holding the regulation invalid to the extent it allows States the uncontrolled option of denying benefits to persons who were discharged for cause or had voluntarily quit their jobs.

It is clear that a major purpose of the 1968 amendment was to retract some of the authority previously delegated to the States under § 407 (a).  *Philbrook* v. *Glodgett,* 421 U. S., at 710.  We, however, do not think this shift of authority from the States to the Secretary required the Secretary to adopt a regulation that precludes any recognition of local policies.  If Congress had intended such a result, it might have changed the statutory language from "unemployment (as defined by the State)" to "unemployment (as defined by the Secretary)."  Instead, § 407 (a) now reads "unemployment (as determined in accordance with standards prescribed by the Secretary)."  The power to "determine" unemployment remains with the States, and we conclude that the power to prescribe "standards" gives the Secretary sufficient flexibility to recognize some local options in determining AFDC–UF eligibility.

The legislative history, we acknowledge, is at some variance with the statutory language.  The effect of the 1968 amend-

---

[17] The *Francis I* court initially held that the Secretary could have left the decision on whether strikers are unemployed up to each State, but that he had failed to do so in the regulation then in effect.  340 F. Supp., at 367–368.  After the regulation was so amended, however, the same court held it invalid, 379 F. Supp., at 81–82, because the Secretary failed to establish "national standards within which the regulations of each of the states were to be channelized and confined."  *Id.,* at 82.  The extent to which any significant options in coverage would be tolerated under this approach is not clear.  The court, however, stopped short of repudiating its previous conclusion that § 407 (a) does not require the Secretary to adopt a "national definition" of unemployment.  379 F. Supp., at 82.

ment is described as to "provide for a uniform definition of unemployment throughout the United States," and as to "authorize a Federal definition of unemployment by the Secretary." S. Rep. No. 744, 90th Cong., 1st Sess., 3–4, 160 (1967). See H. R. Rep. No. 544, 90th Cong., 1st Sess., 3, 17, 108 (1967); 113 Cong. Rec. 32592 (1967) (remarks of Sen. Long). We do not understand these comments to mean, however, that the Secretary is prohibited from allowing the States any options in determining whether or not a person is "unemployed" for purposes of the AFDC–UF program. First, the legislative history cannot be read literally in its claim that the amended statute itself provides a federal definition of unemployment; at best the statute delegates to the Secretary the power to prescribe such a definition. Second, we have no quarrel with the statements in the legislative history that the Secretary is *authorized* to adopt such a uniform definition; we simply hold that he is not *required* to do so.

Certainly, the congressional purpose was to promote greater uniformity in the applicability of the AFDC–UF program. But the goal of greater uniformity can be met without imposing identical standards on each State. In one case, for example, a State was permitted to adopt a somewhat more liberal hours-worked test than the minimum required by the Secretary. *Macias* v. *Finch,* 324 F. Supp. 1252 (ND Cal.), summarily aff'd, 400 U. S. 913 (1970). We conclude, therefore, that the Secretary's approach in the present case is not contrary to the purpose of the statute.

Our conclusion is reinforced by our understanding of the AFDC–UF program as involving the concept of cooperative federalism. The States are free not to participate in the program, and, as we have noted, only about half of them in fact do so. The congressional purpose is not served at all in those States where AFDC–UF is totally unavailable. Accordingly, we should not lightly infer a congressional intention to preclude the Secretary from recognizing legitimate local

policies in determining eligibility. See *New York Dept. of Soc. Services* v. *Dublino,* 413 U. S. 405, 413–414, 421–422 (1973).

We therefore hold that 45 CFR § 233.100 (a)(1) (1976) adequately promotes the statutory goal of reducing interstate variations in the AFDC–UF program. In this respect, the regulation is both reasonable and within the authority delegated to the Secretary.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The regulation under review in this case, 45 CFR § 233.100 (a)(1) (1976), provides that for purposes of the AFDC–UF program, the definition of unemployment need not include, *"at the option of the State,"* a father whose unemployment results from a labor dispute or some conduct that would disqualify him under the State's unemployment compensation law. (Emphasis added.) The Court today sustains this regulation notwithstanding its recognition that "a major purpose of the 1968 amendment was to retract some of the authority previously delegated to the States under § 407 (a)." *Ante,* at 430. The Court reasons, without citation to legislative authority, that "the goal of greater uniformity can be met without imposing identical standards on each State." *Ante,* at 431. Contrary to the majority, I do not believe that the legislative history reflects a congressional intent to achieve merely "greater uniformity" in the definition of unemployment; the legislative record plainly reveals that Congress contemplated a federal definition of unemployment applicable to all States that adopt the AFDC–UF program. Since I do not believe that the subject regulation conforms to this

congressional mandate, I would affirm the judgment of the Court of Appeals.

The Court acknowledges that the legislative history is "at some variance" with its position. *Ante,* at 430. This understates the case; literally *all* of the relevant legislative history repeatedly and unequivocally affirms the strong congressional objective of creating a federal definition of unemployment. It is common ground that Congress changed the wording of § 407 (a) from "unemployment (as defined by the State)" to "unemployment (as determined in accordance with standards prescribed by the Secretary)" for the express purpose of "eliminat[ing] the variations in state definitions of unemployment." *Philbrook* v. *Glodgett,* 421 U. S. 707, 719 (1975). But the Court would have us believe that the statute nevertheless contemplates a regulation leaving it completely within state discretion whether to cover those not working by reason of labor disputes or because of discharge for cause.\* In my view, this is flatly contrary to the

---

\*The Court appears to believe that the statutory language supports its view that the States are still free to define the eligibility criteria for AFDC–UF benefits; but the statute provides that "unemployment" will be "determined in accordance with standards prescribed by the *Secretary*," not the States. (Emphasis added.) The Court concludes that the statutory language contemplates that unemployment will be "determined" by the States and that only the "standards" will be determined by the Secretary. The majority suggests that if Congress had intended for the Secretary to define unemployment, it would have used the words "unemployment (as defined by the Secretary)." The Court's paper-thin distinction between "determining" unemployment and prescribing "standards" totally escapes me. Moreover, according to the Court's logic, if Congress had intended the meaning suggested by the majority, it would have provided that unemployment would be "determined *by the States* in accordance with the standards prescribed by the Secretary"; instead, Congress eliminated all references to the States. The commonsense meaning of the statutory language is that "unemployment" is to be defined by the Secretary, and as we shall see, the statute is susceptible of no other interpretation when read in the context of the legislative history.

thrust of the legislative history, which bears some recitation.

In the Senate, most of the work on the 1968 amendments was done by the Finance Committee. That Committee reported that the bill would:

> "(e) modify the optional unemployed fathers program to provide for a *uniform definition of unemployment throughout the United States.*" S. Rep. No. 744, 90th Cong., 1st Sess., 4 (1967) (emphasis added).

> "A major characteristic of the existing law is the authority left to the States to define 'unemployment.' The committee believes that this has worked to the detriment of the program because of the wide variation in the definitions used by the States. In some instances, the definitions have been very narrow so that only a few people have been helped. In other States, the definitions have been relatively broad. The committee bill is designed to correct this situation and to make other improvements in the program.

> "The amendments proposed by the committee would authorize *a Federal definition of unemployment* by the Secretary . . . ." *Id.,* at 160 (emphasis added).

The Ways and Means Committee, which carried the legislation in the House, adopted the same view:

> "Under present law . . . [t]he definition of unemployment is left up to the individual States. Under the bill . . . *the definition of unemployment would be made by the Federal Government.*" H. R. Rep. No. 544, 90th Cong., 1st Sess., 17 (1967) (emphasis added).

See also *id.,* at 3, 108 (using language almost identical to that adopted by the Senate Finance Committee, S. Rep. No. 744, *supra,* at 3–4, 160).

The Undersecretary of HEW, Wilbur J. Cohen, expressed his Department's view that the new legislation would require a uniform national standard:

> "Today, 22 States have programs to assist [children

who are needy because their fathers are unemployed]. But the differences between State programs are great. States may define unemployment as narrowly or broadly as they wish, requiring substantial previous work experience or no work experience. This variation in definition of unemployment is shown clearly by three adjacent Southwestern States, Arizona, Utah, and Colorado. Each of these States has a population of between 1 and 2 million, yet in Arizona only 19 families of unemployed parents received AFDC in May, while during the same month there were 880 in Utah and 1,600 in Colorado. Arizona's narrow definition of unemployment has kept its program to a token level.

"The House bill continues to allow States to choose whether they will include dependent children of unemployed parents under AFDC. But for the first time the House will set a *Federal definition of unemployment. We are in complete agreement that there should be a Federal definition of unemployment established by the Congress and the Secretary.*" Hearings on H. R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., 268 (1967) (emphasis added).

The members of the Senate Finance Committee expressed no doubt as to the meaning of the Undersecretary's remarks: "Senator WILLIAMS: I notice you say you are in complete agreement that there should be a *Federal definition of unemployment.*" *Id.,* at 269 (emphasis added).

Finally, after the enactment of the 1968 amendments, the Senate Finance Committee was unequivocal in summing up the amendments to the unemployed fathers provisions: "The amendments provide for a *Federal definition of unemployment* for States which have AFDC–UF programs." Senate Committee on Finance, 90th Cong., 2d Sess., Report on Social Security Amendments of 1967—Pub. L. 248, Brief Summary of Major Provisions and Detailed Comparison with

Prior Law 3 (July 15, 1968) (emphasis added). See also *id.,* at 63 ("Unemployment will be defined by the Secretary of Health, Education, and Welfare"); 113 Cong. Rec. 23054 (1967) (remarks of Rep. Mills) ("[W]e found . . . that the fact that the definition of unemployment is left to the States has had unfortunate results. . . . The Bill would correct this situation"); *id.,* at 32592 (remarks of Sen. Long) ("[T]here would be a Federal definition of 'unemployment' "); *id.,* at 36373–36374 ("[T]he Secretary will prescribe standards for the determination of what constitutes unemployment. The term is defined by the States under present law"); Senate Committee on Finance and House Committee on Ways and Means, 90th Cong., 1st Sess., Report on Summary of Social Security Amendments of 1967, p. 17 (Comm. Print 1967) ("[T]he Secretary will prescribe standards for the determination of what constitutes unemployment").

Unlike the majority, I have no doubt that the legislative history means what it says and confines the regulatory authority of the Secretary; by amending § 407 (a) to place the responsibility for defining unemployment on the Secretary, Congress intended to establish "a uniform definition of unemployment throughout the United States." S. Rep. No. 744, *supra,* at 4; H. R. Rep. No. 544, *supra,* at 3. While I agree with the majority that this Court should defer to any reasonable definition given by the Secretary to the term "unemployment," I cannot agree, in light of the legislative history, that the Secretary may simply delegate the responsibility for defining that term to the States, for in important respects this would simply return the law to the situation existing prior to the amendment defining that term to the States. Here, the Secretary has promulgated a regulation describing a rather broad category of individuals who may be eligible for AFDC–UF benefits but has then permitted the States to include or exclude those individuals from eligibility "at the option of the State."

Contrary to the obvious intent of Congress, this leaves to state discretion the coverage of important categories of claimants and invites the very diversity in coverage that the 1968 amendment was designed to prevent. I cannot believe that this regulation conforms to the statutory purpose. Accordingly, I respectfully dissent.